| | |
|---|---|
| JANET JOHNSON, ) <br> ) <br> Plaintiff,  ) <br> ) <br> vs.  ) <br> ) <br> DEPUY SYNTHESES PRODUCTS, ) <br> INC. and DEPUY SYNTHESES ) <br> SALES, INC.,  ) <br> ) <br> Defendants. ) <br> _____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Defendants' Motion to Exclude Testimony of the Plaintiff's Expert, James F. Lane, P.E. [Doc. 23] and the Defendants' Motion for Summary Judgment [Doc. 24].

## I.  PROCEDURAL BACKGROUND

On November 30, 2020, the Plaintiff Janet Johnson filed this products liability action in the Superior Court for Avery County, North Carolina against the Defendants DePuy Syntheses Products, Inc. and DePuy Syntheses Sales, Inc.[1] [Doc. 1-1: Complaint]. In her Complaint, the Plaintiff alleged that

---

[1] The Plaintiff also brought suit against Depuy Synthes, Inc., Johnson & Johnson, and Johnson & Johnson International, Inc., but the Plaintiff has voluntarily dismissed her claims against these defendants. [See Doc. 16: Stipulation of Dismissal].

she suffered injury as a result of the fracture of a DePuy-manufactured stainless steel compression plate (the "plate"), which had been implanted in the Plaintiff's right leg following a serious motorcycle accident. [Id. at 4-5]. The Plaintiff asserted claims against the Defendants for breach of the implied warranty of merchantability and breach of express warranty under North Carolina state law.[2] [Id. at 6-8]. On February 1, 2021, the Defendants removed the action to this Court on the basis of diversity jurisdiction. [Doc. 1: Notice of Removal].

The Defendants now move to exclude the opinions and testimony of the Plaintiff's expert, James F. Lane, P.E. [Doc. 23]. The Defendants also move for summary judgment as to all of the Plaintiff's claims. [Doc. 24]. The Plaintiff has responded to the Defendants' motions [Docs. 27, 28], and the Defendants have replied [Docs. 29, 30]. This matter is therefore fully briefed and ripe for disposition.

---

[2] While the Plaintiff asserted an express warranty claim in her Complaint, she has failed to present a forecast of evidence that the Defendants communicated any relevant express warranty to her, and she concedes that the Defendants are entitled to summary judgment on this claim [See Doc. 28 at 7 n.1]. Accordingly, the Plaintiff's express warranty claim will be dismissed.

In her Complaint, the Plaintiff also asserted an alternative claim for breach of the implied warranty of merchantability under Tennessee law. [Doc. 1-1: Complaint at 7-8]. The Plaintiff, however, fails to address this cause of action in her response brief and appears to have been abandoned this claim. Accordingly, the Court will not address it further.

2

## II. STANDARD OF REVIEW

### A. Admissibility of Expert Testimony

Although state law controls the substantive claims in this diversity action, Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109 (4th Cir. 1995), the admissibility of expert testimony is governed by federal law, Bryte ex rel. Bryte v. Am. Household, Inc., 429 F.3d 469, 476 (4th Cir. 2005).

Federal Rule of Evidence 702 is the legal standard by which proposed expert testimony is evaluated. Nease v. Ford Motor Co., 848 F.3d 219, 228-29 (4th Cir. 2017) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588 (1993)). Rule 702 permits expert testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under Rule 702, trial judges must act "as 'gatekeepers of expert testimony' to protect the judicial process from 'the potential pitfalls of junk science.'" Sardis v. Overhead Door Corp., 10 F.4th 268, 275 (4th Cir. 2021) (quoting United States v. Bonner, 648 F.3d 209, 215 (4th Cir. 2011)). To fulfill this function, a court must "ensure that an expert's testimony both rests on a *reliable*

foundation and is *relevant* to the task at hand." Nease, 848 F.3d at 229 (alteration omitted) (emphasis in original) (quoting Daubert, 509 U.S. at 597).

An expert's opinion is "reliable" if it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation," and if any inferences derived by the expert are "derived using scientific or other valid methods." Id. (emphasis in original) (quoting Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999)). Daubert provides a number of "guideposts" to assist trial courts in determining the reliability of a proffered expert opinion: (1) whether the expert's theory or technique can, or has been, tested; (2) whether the theory or technique has been subject to peer review and publication; (3) in the case of a particular technique, the known or potential rate of error; and (4) whether the methodology is generally accepted in the witness's field of expertise. Id. (citing Daubert, 509 U.S. at 593-94). These guideposts, however, are not exhaustive, as the relevance of some factor may "depend[] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (citation omitted). A trial court has "broad latitude" to determine whether these guideposts are a "reasonable measure of reliability in a particular case." Id. at 153 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997)).

An expert's opinion is "relevant" if it has "a valid scientific connection to the pertinent inquiry" and helps "the trier of fact to understand the evidence or to determine a fact in issue." Daubert, 509 U.S. at 591-92. "[I]f an opinion is not relevant to a fact at issue, Daubert requires that it be excluded." Sardis, 10 F.4th at 281.

### B. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it "might affect the outcome of the suit under the governing law." Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(a); see also Celotex, 477 U.S. at 324. Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkt. Inc. v. J.D. Assocs. Ltd., 213 F.3d 175, 180 (4th Cir. 2000) (citation omitted). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255.

## III. FACTUAL BACKGROUND

On May 24, 2016, the Plaintiff was riding her motorcycle in Western North Carolina when she collided head-on with a car. [Doc. 24-1: Pl.'s Med. Records at 6-7, 9-10; Doc. 24-5: Deposition of Dr. Holly Pilson ("Dr. Pilson Dep.") at 37-38]. She suffered significant injuries as a result of this crash, including fractures in the shafts of her left and right femurs and a fracture in the neck of her right femur. [Doc. 24-1: Pl's Med. Records at 6; Doc. 24-5: Dr. Pilson Dep. at 24, 28].

The Plaintiff was airlifted to Johnson City Medical Center in Tennessee for treatment of her injuries, where an orthopedic surgeon performed a right open reduction and internal fixation ("ORIF") of the fractured right femur shaft with a plate, screws, and cables. [Doc. 24-1: Pl.'s Med. Records at 8-9]. The Plaintiff was discharged from the hospital on June 1, 2016. [Id. at 1-4, 15-21]. The Plaintiff received follow-up care from Dr. Bart McKinney at Appalachian Orthopedic Associates, PC. [Doc. 24-6: Pl.'s Med. Records at 1]. After approximately nine weeks, x-rays revealed "[n]o callus or healing noted of distal femur." [Id. at 2].

On September 4, 2016, the Plaintiff rolled over in bed and felt a "pop" in her right thigh. [Doc. 28-2: Pl.'s Aff. at 2]. The Plaintiff was transported to Wake Forest Baptist Hospital in Winston-Salem, North Carolina for

7

treatment. [Id. at 3]. There, it was determined that the plate installed in the prior surgery had broken, and Dr. Jason Halvorson performed a revision surgery to remove the broken plate and re-splint the right femur. [Doc. 24-4: Deposition of Dr. Jason Halvorson ("Dr. Halvorson Dep.") at 47; Doc. 24-2: Pl.'s Med. Records at 1-2]. When Dr. Halvorson opened the Plaintiff's leg to conduct the operation, he noted that "[t]here was minimal to no callus at the fracture site." [Doc. 24-2: Pl.'s Med. Records at 4; see also Doc. 24-4: Dr. Halvorson Dep. at 26 (explaining that said treatment note reflects an observation that "visually looking at it[,] it did not seem that there was much healing noted at the fracture.")]. Because the Plaintiff's femur had not healed after the initial surgery—medically known as a nonunion—Dr. Halvorson sought to stimulate healing by placing a bone-graft, cadaveric bone, and synthetic bone at the fracture site. [Doc. 24-2: Pl.'s Med. Records at 4; Doc. 24-4: Dr. Halvorson Dep. at 26-28]. Dr. Halvorson also re-splinted the broken pieces of the Plaintiff's femur with a new internal fixation device. [Doc. 24-2: Pl.'s Med. Records at 4; Doc. 24-4: Dr. Halvorson Dep. at 27-28].

## IV. DISCUSSION

### A. Defendants' Daubert Motion

The parties in this case agree that the plate broke due to "high-cycle reverse-bending fatigue." The Defendants contend that this fatigue resulted

8

from disunion of the bone, which in turn put undue stress on the plate. The Plaintiff, on the other hand, contends that the fatigue resulted from a manufacturing defect in the plate itself, thereby breaching the implied warranty of merchantability. In support of this claim, the Plaintiff offers the expert opinion of James F. Lane, P.E. to establish that the plate was defective when the Defendants sold it and that this defect was the cause of her injury. See DeWitt v. Eveready Battery Co., 355 N.C. 672, 682-83, 565 S.E.2d 140, 147 (2002).[3]

In his report dated July 23, 2021, Mr. Lane offers, *inter alia*, the following conclusions:

> The microstructure of the stainless steel femur plate was irregular and was a manufacturing-related defect that most likely contributed to the initiation of the fatigue cracks in the femur plate. Additional destructive analysis is necessary to determine the extent this manufacturing defect contributed to the failure.

---

[3] Under North Carolina General Statute § 25-2-314, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.C. Gen. Stat § 25-2-314(1). To make out a prima facie case for personal injury based upon a breach of the implied warranty of merchantability, a plaintiff must establish: (1) "that the goods bought and sold were subject to an implied warranty of merchantability"; (2) "that the goods did not comply with the warranty in that the goods were defective at the time of sale"; (3) "that his injury was due to the defective nature of the goods"; and (4) "that damages were suffered as a result." DeWitt, 355 N.C. at 683, 565 S.E.2d at 147 (2002) (quoting Morrison v. Sears, Roebuck & Co., 319 N.C. 298, 301, 354 S.E.2d 495, 497 (1987)). Goods are "defective" when they are not "fit for the ordinary purposes for which such goods are used." Cockerham v. Ward, 44 N.C. App. 615, 625, 262 S.E.2d 651, 658 (1980) (quoting N.C. Gen. Stat. § 25-2-314(2)(c)).

[Doc. 23-1: Lane Report at 4]. To support these conclusions, Mr. Lane explained in his report as follows:

> The microstructure in the longitudinal direction of the femur plate was banded and the transverse direction exhibited swirling banding. The more highly deformed regions of the structure were harder, potentially creating metallurgical notches along the interior and exterior surfaces that could act as stress concentration points for the initiation of fatigue cracks. The irregular microstructure most likely contributed to the premature failure of the fixation device.

[Doc. 23-1: Lane Report at 7].

The Defendants challenge the admissibility of the opinions and testimony of Mr. Lane, contending that his opinions are irrelevant and unreliable. [Doc. 23].

Mr. Lane opines that the microstructural irregularities within the plate constitute a manufacturing defect. Mr. Lane, however, fails to explain how the plate's alleged microstructural inconsistency has any relevance to the question of whether the device was unfit for its ordinary purposes. Particularly, he fails to articulate any standard of microstructural consistency to which internal fixation devices must adhere in order to sustain the forces placed upon them during ordinary use. Cf. Sardis v. Overhead Door Co., 10 F.4th 268, 289 (4th Cir. 2021) (holding that expert's opinion was irrelevant where he could not articulate the testing standard to which, according to

10

expert, defendant was required to adhere). Mr. Lane does not address what stresses such a plate would have to endure; the length of time the plate's integrity would have to be maintained until expected bone union; or whether the weight or other physical characteristics of the patient would affect the expected stresses. Moreover, he did not address the degree to which any microstructural inconsistency in the plate would cause it to fail under such expected stress, while a more consistent structure would not. The Plaintiff's forecast of evidence reveals no other testimony from which the jury could determine the requirements of a standard for microstructural consistency in these types of devices. See id. ("No other witness offered testimony on these unidentified standards."). Without evidence of such a standard, a jury would not be able to ascertain whether the plate's alleged microstructural inconsistency bears any relationship to whether the device was unfit for its ordinary purposes and thus was defective. Id. All that the jury would have to "verify" such relationship is Mr. Lane's "vague *ipse dixit*" that this microstructural irregularity is a manufacturing-related defect. Id. That is insufficient under Rule 702. Id.; see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). In short, Mr. Lane may

11

have expressed the scientific opinion that the plate contained a microstructural irregularity, but he failed to offer any support for his conclusion that such irregularity is a defect. Thus, Mr. Lane's conclusory opinion that the irregularity in the plate constituted a manufacturing defect is irrelevant and unreliable, and must be excluded.

Even if Mr. Lane had presented an admissible opinion that the identified microstructural irregularity was a manufacturing defect, he fails to present any admissible evidence that this defect was a proximate cause of the plate's failure and thus of the Plaintiff's injury. Mr. Lane opines that the microstructural irregularity "likely contributed to the initiation of the fatigue *cracks* in the femur plate" [Doc. 23-1: Lane Report at 4]; however, he does not actually opine that this irregularity contributed to the ultimate *failure* of the plate. Particularly, Mr. Lane does not state any causation opinion to a reasonable degree of scientific certainty; rather, he theorizes that the plate's inconsistent microstructure "most likely" reduced its ability to withstand high-cycle reverse bending fatigue. [Lane Report, Doc. 23-1 at 4]. Mr. Lane, however, fails to express any scientific certainty of his opinion in any respect.

There is also no indication that Mr. Lane conducted *any* testing in formulating this opinion. Cf. Sardis, 10 F.4th at 291; Nease, 848 F.3d at 232 (emphasizing the unreliability of expert opinions which have not been

12

tested). Without testing, Mr. Lane's theory is merely a hypothesis—not scientific knowledge within the meaning of Rule 702. Nease, 848 F.3d at 232 (holding that a hypothesis is not scientific knowledge under Rule 702); see also Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999) ("A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.") (citing Daubert, 509 U.S. at 590, 592-93). Critically, Mr. Lane himself acknowledged in his report that "[a]dditional destructive analysis is *necessary* to determine the extent this manufacturing defect contributed to the failure." [Doc. 23-1: Lane Report at 4 (emphasis added)]. In other words, he essentially concedes that his proffered causation opinion is merely an untested hypothesis. Moreover, this provides a jury nothing from which it might reasonably determine that the irregularity was a *proximate* cause.

The Plaintiff contends that Mr. Lane requested to perform additional destructive testing of the plate's fracture sites in order to determine the extent of the contribution of the alleged defects to the plate's fractures, but that the Defendants refused to allow Mr. Lane to perform any further testing. The Plaintiff argues that the "Defendants should not be allowed to benefit from their own refusal to allow further destructive testing near the fracture sites."

[Doc. 27 at 18 n.4]. This argument, however, fails to aid the Plaintiff. If further testing around the fracture site was necessary to verify or falsify Mr. Lane's causation theory, and the Defendants refused[4] to allow such testing to occur, then the Plaintiff could have sought leave of court to conduct such testing. See Fed. R. Civ. P. 34(a) (allowing party to serve request to conduct testing of an item in the responding party's possession or control) (Fed. R. Civ. P. 37(a)(3)(B)(iv) (allowing party to move to compel Rule 34 testing). The Plaintiff, however, did not do so.

The hypothetical nature of Mr. Lane's causation opinion is further evidenced by his failure to rule out (or even consider) potential alternative causes for the plate fracturing, such as femoral nonunion. See Cooper v. Smith & Nephew, 259 F.3d 194, 201-03 (4th Cir. 2001) (reasoning that expert's failure to address defendant's competing causation theories underscored the unreliability of expert's causation opinion); Oglesby, 190 F.3d at 250 (explaining that lack of testing undermined expert's ability to "eliminate other equally plausible causes for" the product failure). In his report, Mr. Lane does not indicate that he even considered the possibility that there was some alternative cause for the fracture. That omission is fatal

---

[4] The Defendants deny that the Plaintiff ever requested their consent for additional testing. [See Doc. 29 at 3-6].

here where the Plaintiff's own treating physicians testified that the failure of the Plaintiff's femur bone to heal quickly enough could have caused weakness in the plate and rendered it susceptible to breaking.[5] Cf. Cooper, 259 F.3d at 201-03 (dismissing expert's opinion as unreliable where expert failed to consider alternative causes which the record and relevant medical literature indicated were especially likely to have caused plaintiff's injury). In formulating his causation opinion, Mr. Lane did not account for the potential effects of the femoral nonunion. As such, there is an "analytical gap" between the evidence in the record and his conclusion, which underscores the unreliability of his opinion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (explaining that a federal court may exclude expert testimony where it finds "that there is simply too great an analytical gap between the data and the opinion proffered" (citation omitted)).

---

[5] Dr. Halvorson explained during his deposition that the torquing which the plate endures during the healing process—either from the patient moving the limb to which the plate is attached or loading the plate with bodyweight—will eventually cause the plate to weaken. [Doc. 24-4: Dr. Halvorson Dep. at 43 (analogizing the plate to a paperclip)]. This weakening renders the plate susceptible to breaking if the bone to which the plate is attached does not heal quickly enough. [Doc. 24-5: Dr. Pilson Dep. at 50 (explaining the "race to heal"); Doc. 24-4: Dr. Halvorson Dep. at 43 (explaining that a plate will eventually break if it is repetitively torqued without the support provided by a healed femur)]. When Dr. Halvorson removed the broke plate, more than three months after it was implanted, he noted that "it did not seem that there was much healing noted at the fracture." [Doc. 24-4: Dr. Halvorson Dep. at 26; see also id. at 45 (describing the condition of the Plaintiff's femur at the time the plate was removed as "clearly . . . a nonunion")].

For all these reasons, the Court will exclude Mr. Lane's testimony regarding the existence of a manufacturing-related defect that "most likely" contributed to the failure of the plate.[6]

### B. Defendants' Motion for Summary Judgment

The Defendants move for summary judgment as to the Plaintiff's claim for breach of the implied warranty of merchantability, arguing that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that the plate was defective at the time of sale.

The defect element of an implied warranty of merchantability claim may be proven by direct evidence or inferred from circumstantial evidence showing that the product malfunctioned when put to its ordinary use. DeWitt v. Eveready Battery Co., 355 N.C. 672, 684, 565 S.E.2d 140, 147 (2002). "The burden is upon the purchaser to establish a breach by the seller of the warranty of merchantability by showing that a defect existed at the time of the sale." Morrison v. Sears, Roebuck & Co., 319 N.C. 298, 301, 354 S.E.2d 495, 497 (1987) (quoting Cockerham v. Ward, 44 N.C. App. 615, 624-25, 262 S.E.2d 651, 658 (1980)).

---

[6] Because the Court has excluded Mr. Lane's opinion as irrelevant and unreliable, the Court need not address the Defendants' challenges to his qualifications as an expert.

Here, the Plaintiff seeks to use Mr. Lane's testimony to prove that the plate had a specific defect at the time of sale. [Doc. 28 at 10-11]. The Court has determined, however, that Mr. Lane's opinion regarding the existence of a manufacturing defect in the plate is inadmissible under Daubert and Federal Rule of Evidence 702. Without expert testimony, the Plaintiff has no direct evidence of a defect within the plate.

Having failed to present a forecast of direct evidence of a defect, the Plaintiff must demonstrate sufficient circumstantial evidence from which a defect can be inferred. To assist the Court in determining whether a plaintiff has presented sufficient circumstantial evidence to allow for an inference of a defect in a particular case, the North Carolina Supreme Court has identified a non-exclusive list of factors to consider, including: (1) the malfunction of the product; (2) expert testimony regarding possible causes of the malfunction; (3) the relevant history of the product and the timing of the malfunction in relation to when the plaintiff acquired the product; (4) evidence of similar incidents involving the same product; (5) evidence that eliminates other possible causes of the accident; and (6) evidence that tends to establish that such an accident would not have occurred in the absence of a defect. DeWitt, 355 N.C. at 689-90, 565 S.E.2d at 151. A plaintiff need not satisfy all of these factors in order to make out a circumstantial case. Evans

v. Evans, 153 N.C. App. 54, 61, 569 S.E.2d 303, 308 (2002). These factors should be considered together, with no one factor being dispositive. Carlton v. Goodyear Tire & Rubber Co., 413 F. Supp. 2d 583, 590 (M.D.N.C. 2005). Not all of these factors are equal, however, and some may be afforded greater weight depending upon the particular circumstances of the case. Id.

The Plaintiff concedes that the third, fourth, fifth, and sixth DeWitt factors are irrelevant here. The Plaintiff expressly relies only on the first and second factors to argue that there is circumstantial evidence of a defect that is sufficient for her claim to survive summary judgment. As for the first factor—that is, whether the plate malfunctioned—it is undisputed that the plate broke while surgically attached to the Plaintiff's right femur. While the fracture certainly *could* have been the result of some sort of product defect, that standing alone is insufficient for a reasonable jury to conclude that the plate was defective. See id. ("The evidence of the [tire] blowout in this case would not alone constitute sufficient circumstantial evidence to infer a product defect, but it allows the Court to continue by considering the other DeWitt factors."). Thus, the Plaintiff relies entirely on the second DeWitt factor, namely, Mr. Lane's expert testimony. This evidence, however, has been excluded as irrelevant and unreliable. As such, the Plaintiff's forecast of evidence contains no admissible expert testimony to support her claim.

After careful consideration of the relevant DeWitt factors, the Court concludes that the Plaintiff has failed to present circumstantial evidence capable of supporting the inference that the plate more likely than not broke as a proximate result of a defect therein. The "Plaintiff's case is really based on nothing more than conjecture and speculation[,] [and] [t]his is not enough to survive summary judgment." Carlton, 413 F. Supp. 2d at 593 (citation omitted). For these reasons, the Defendant's motion for summary judgment will be granted as to the Plaintiff's claim for breach of the implied warranty of merchantability.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion to Exclude Testimony of the Plaintiff's Expert, James F. Lane, P.E. [Doc. 23] is **GRANTED**, and the Defendants' Motion for Summary Judgment [Doc. 24] is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. A Judgment consistent with this Memorandum of Decision and Order shall be entered simultaneously herewith.

**IT IS SO ORDERED**.

Signed: May 19, 2022

Martin Reidinger
Chief United States District Judge